**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **DEDRA E. PETTIS,** * | |
| * | |
| **Plaintiff,** * | |
| * | |
| **vs.** * | **Civil Action No. 05-00608-WS-B** |
| * | |
| **MICHAEL J. ASTRUE,** [1] * | |
| **Commissioner of Social Security,** * | |
| * | |
| **Defendant.** * | |

**REPORT AND RECOMMENDATION**

Plaintiff Dedra E. Pettis ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for widow's insurance benefits[2] and supplemental security income under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq. and 1381 et seq. This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The parties waived oral argument on November 15, 2006. (Doc. 14). Upon consideration of the administrative record and memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED.**

**I.    Procedural History**

On July 22, 2003, Plaintiff protectively filed an application for benefits alleging that she has been disabled since March 3, 1999,[3] due to arthritis, diabetes, back problems, right arm dysfunction,

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he has been substituted as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]The period in which Plaintiff must establish her entitlement to disabled widow's benefits commenced with her 50th birthday on July 21, 2003. (Tr. 60). 20 C.F.R. § 404.335.

[3]Plaintiff has also alleged that her onset date was March 2002. (Tr. 115, 124, 127).

breathing problems/asthma, poor vision, and an inability to lift, carry, walk or stand for long periods of time. (Tr. 19, 59-61, 77, 86, 392-404, 413-428). Plaintiff's initial applications were denied upon initial review and upon reconsideration. (Id. at 40, 405-412, 429-430). Plaintiff timely filed a Request for Hearing before an Administrative Law Judge ("ALJ"). (Id. at 38, 41-42). On August 24, 2004, an administrative hearing was held before Administrative Law Judge Glay E. Maggard ("ALJ" or "ALJ Maggard"), and was attended by Plaintiff, her representative and a vocational expert. (Id. at 457-494). On February 4, 2005, ALJ Maggard issued an unfavorable decision, denying Plaintiff's claims based upon his finding that she could perform a significant number of jobs in the economy. (Id. at 16-30). On August 26, 2005, the Appeals Council ("AC") denied Plaintiff's request for review thereby making the ALJ's decision the final decision of the Commissioner of Social Security. (Id. at 7-10, 14). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

## II.   Background Facts

Plaintiff was born on July 21, 1953 and was 51 years old at the time of the administrative hearing. (Tr. 19, 60-75, 124, 461-462). She is 5'2" tall and her weight has fluctuated from 226 to almost 300 pounds.[4] (Id. at 76, 114, 127, 465). Plaintiff has less than a 12th grade education and reported that while she has worked as a sitter in a private home, she has not worked at a paying job in 15 years due to problems standing. (Id. at 29, 78, 83, 121, 132, 144-152, 163, 310, 463, 464). At the August 2004 hearing, Plaintiff testified that she takes 12 different medications[5] on a daily

---

[4]The undersigned notes that while Plaintiff testified that she weighed 379 pounds (Tr. 465), all of the medical records place her under 300 pounds, such that her testimony was obviously a misstatement.

[5]Plaintiff's medications include Insulin, Norvasc, Glucovance, Lasix, Avandia, Ibuterol, Advair, Coumentan, Ativar, Albuterol, Altace, Decadron, Prevacid, Slow Mag, Duo Neb Unit Dose, Humulin 70/30, Glucophage, Diclofenac, Ibuprofen 800 mg, Zyrtec, Accupril, Hetos, Potassium Chloride, Novolin, Bextra,

basis, and that she had trouble seeing due to diabetic complications.  (Id. at 460).  Plaintiff testified

that some of her medication causes her to retain fluid, and cause her blood sugar to increase.  (Id.

at 465-466).  Plaintiff testified that she is still accumulating fluid and swelling in her hands, feet and

legs.  (Id. at 467-468).  According to Plaintiff, the swelling, which she has every day, results in

problems gripping and is so bad that whenever she stands or sits for a certain length of time, she can

hardly stand, and she develops blisters and cannot wear shoes.  (Tr. 468-471).  She takes Lasix to

help with the swelling, but it causes her to go to the bathroom often.  (Id. at 472-473).  Plaintiff

testified that based upon her doctor's advice, she elevates  her legs anytime she is sitting or laying

down (i.e., she  props them on 2-3 pillows, higher than her waist).  (Id. at 469).

     Regarding other physical problems, Plaintiff testified that she has diabetes, that she takes

Insulin, and that she has trouble controlling her blood sugar levels, which range from 34-400.  (Id.

at 473-474).  She also reported that she had surgery on her right hand to remove glass (imbedded

from a fall during which her hand went through a window approximately 20 years ago) and that she

had surgery to remove her right kneecap when she was in the 5th grade.  (Id. at 470-471).  According

to Plaintiff, she has been using a cane for the last two years to help her when her knee gives out.  (Id.

at 475-476).  She also reported pain in her right thumb, her back, right shoulder, arm, neck and feet.

(Tr. 471-476).  She testified that her level of pain is a "9" on the 1-10 pain scale; however, when she

takes her medication (Ibuprofen 800 mg, Cortisone shots and/or Darvocet), she has level "9" pain

for only 4-5 hours.  (Id. at 476-477).  Plaintiff testified that she considers her worst problems to be

diabetes and pain associated with her back and feet.  (Id. at 484-485).  Plaintiff reported that she can

---

Chlorzoxazone, Hydrochlorothiazide, Furosemide, Atrovent, Amitriptyline, Propo-N/APAP, Methylpred, Duratuss
DM, Zithromax, Verapamil, Atrovent, Humalog and Tylenol PM**.**  (Id. at 82, 91, 120, 131, 172, 177, 182-192).

stand about 5 hours in an 8 hour day, on and off, but then has to sit down.  (Id. at 477-483).  She

estimated that she can lift about 5 pounds, and walk perhaps 5 minutes.  (Id.)

As for daily activities, Plaintiff testified that her daughter helps her with household chores

such as house cleaning and preparing meals, and that she also assists her in getting dressed.  (Id. at

469).  Plaintiff testified that she is able to prepare a meal for herself, can watch television, and that

she attends church.  (Tr. 477-483).  She also testified that she continues to smoke 1-2 cigarettes per

day even though her doctors have told her to quit smoking and to lose weight.  (Id.)

**III.    Issues on Appeal**

A.    Whether the ALJ erred by failing to assign controlling weight to the opinion of Plaintiff's
treating physician?

B.    Whether the ALJ erred by failing to properly consider the effects of Plaintiff's obesity?

**IV.    Analysis**

**A.    Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  This Court's

review is limited to determining 1) whether the decision of the Secretary is supported by substantial

evidence, and 2) whether the correct legal standards were applied.  Martin v. Sullivan, 894 F.2d

1520, 1529 (11th Cir. 1990).[6]  A court may not decide the facts anew, reweigh the evidence, or

substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th

Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial

evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703

F.2d 1233, 1239 (11th Cir. 1983) (finding that substantial evidence is defined as "more than a

---

[6]This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen,
826 F.2d 996, 999 (11th Cir. 1987).

scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

### B.    Discussion

In the case sub judice, to be eligible for disabled widow's benefits, Plaintiff must prove that she was married to the deceased wage earner for at least 9 months; the wage earner was fully insured in January 1999 when he died; Plaintiff has not remarried; Plaintiff's disability began in January 1999 and will continue through December 31, 2005; and that Plaintiff is at least 50 years old.  20 C.F.R. § 404.335.  See generally Lewis v. Barnhart, 285 F.3d 1329 (11th Cir. 2002).

An individual who applies for Social Security disability benefits must prove her disability. 20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[7]  See, e.g., Crayton v. Callahan,

---

[7]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's

120 F.3d 1217, 1219 (11th Cir. 1997).

Here, the ALJ found that Plaintiff met the threshold requirements to qualify for disabled widow's benefits and that she had not worked since she allegedly became disabled.  (Tr. 19-30). The ALJ then concluded that while Plaintiff "possesses combined severe, functionally limiting respiratory, endocrine and musculoskeletal-related impairments[,]" her impairments do not meet or medically equal any of the listed impairments in 20 C.F.R., Appx. 1, Subpt. P, Reg. No. 4.  (Id.)  The ALJ explained that Plaintiff's allegations of chronic, debilitating pain, swelling, muscle weakness, shortness of breath, dizziness, easy fatigability, and other related symptoms, cannot at all be considered credible to the extent described.  (Id.)  The ALJ noted that Plaintiff has provided inconsistent information regarding her work history, and that the record does not definitively establish the presence of past vocationally relevant work ("PRW") to which she could return.  (Id.) The ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform substantially all of the physical elements of light work, except for a few environmental restrictions. (Id.)    The ALJ concluded that Plaintiff is able to make a successful vocational adjustment to significant numbers of light jobs existing in the national economy with her individualized vocational characteristics and that the VE's testimony establishes the incidence of such work in significant numbers in the national economy for a hypothetical individual similarly situated to the claimant. (Id.)  Accordingly, the ALJ concluded that concluded that Plaintiff is not disabled.  (Tr. 19-30).

The undersigned finds that substantial evidence of record supports the ALJ's decision.  The

---

burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

medical records reflect that Plaintiff was treated at the ER at the Mobile Infirmary Medical Center ("Infirmary") on November 16, 1999, for right shoulder, neck, arm and leg pain. (Tr.310-313). An x-ray of her cervical spine revealed a small bone fragment near the C5/6 space and bony neural foramina. (Id. at 313). Her shoulder x-ray was negative. (Id.) It was noted that Plaintiff weighed 210 pounds and that her range of motion ("ROM") in her right shoulder was limited. (Id. at 311-312). She was assessed with degenerative joint disease ("DJD") in her cervical spine and bursitis, and given a joint injection in her shoulder and a trigger point injection. (Id.) Upon discharge, she was in fair condition and was ambulatory. (Id. at 312). Plaintiff was given Toradol and Ativan as well as a left wrist splint. (Tr. 311). On May 7, 2000, Plaintiff returned to the Infirmary ER for a rash on both arms and swollen right eye. (Id. at 314-317). At that time, she reported having had shoulder and neck pain radiating to her hand, for 3-4 months, limited dorsiflexion in her left wrist, and that it was swollen and tender. (Id. at 315). Her exam revealed that she had a tender neck, limited ROM with arms due to pain and tender to dorsiflexion in her left wrist. (Id.) She was assessed with chronic cervical pain with radiation to her right arm and shoulder and a tender left wrist. (Id.) She was given a soft C collar, left arm splint and Toradol. (Id.)

On August 22, 2000, Plaintiff presented to the ER at the University of South Alabama ("USA"), complaining of shoulder and hand pain and a right eye cyst. (Tr. 193-195). Her x-rays were normal. (Id. at 195). She was prescribed medication and was discharged with a diagnosis of osteoarthritis and hypertension. (Id. at 193). One week later, she reported to the Stanton Road Clinic ("Stanton Clinic") with complaints of chronic pain. (Id. at 196). She was diagnosed with right shoulder tendonitis, hand pain, and given a trigger point injection to the right thumb. (Id.) On March 22, 2001, she reported to the Franklin Memorial Primary Health Center ("Franklin")

complaining that she had glass in her hand and that arthritis in her right arm was causing her severe pain for which she was wearing a brace.  (<u>Id</u>. at 204-205).  Plaintiff reported that she smoked ½ pack of cigarettes per day (and had for the past 31 years) and that she had a history of asthma.  (Tr. 204). Her examination was normal.  (<u>Id</u>. at 205).  It was noted that she weighed 247 pounds, and she was referred to Stanton Clinic for hand surgery to remove the glass.  (<u>Id</u>.)

From March 19-22, 2002, Plaintiff was treated at the Infirmary for shortness of breath.  (<u>Id</u>. at 318-332).  Upon admission, she had high blood sugar levels and was in mild respiratory distress. (<u>Id</u>.)  It was also noted that she was overweight.  (<u>Id</u>.)  Her exam revealed expiratory wheezing bilaterally, but no cyanosis, clubbing or edema.  (<u>Id</u>. at 321).  She was initially diagnosed with underlying chronic obstructive pulmonary disease ("COPD") with asthmatic bronchitis, without acute exacerbation/status asthmaticus/unspecified; noninsulin dependent diabetes mellitus ("NIDDM") with ketoacidosis and hyperglycemia, type II or unspecified type; adrenal cortical steroids causing adverse effects in therapeutic use; elevated blood pressure reading without diagnosis of hypertension; transient hypertension; and a past history of a previous hand injury, chronic eczema on her hands, a severed tendon of her little finger on her left hand and a history of some glass shards in her right hand.  (Tr. 318, 322).  On later exam, her extremities showed 1+ dorsalis pedis pulses.  (<u>Id</u>. at 325).  Her chest x-ray was normal.  (<u>Id</u>. at 332).  She was diagnosed, upon discharge, to be in improved and stable condition, but having a final diagnosis of asthmatic bronchitis, COPD, Type II diabetes and obesity.  (<u>Id</u>. at 319).  Her blood sugar was back at baseline and she was encouraged to quit smoking.  (<u>Id</u>. at 319).  It was also recommended that she undertake a 1,800 ADA calorie diet; take Insulin, Protonix and Glucovance; check her blood sugar; go to the diabetes resource center for evaluation and education; and obtain a lipid profile; and an albumin and

creatinine ratio.  (Id. at 324).

On March 26, 2002, Plaintiff returned to Franklin, at which time she weighed 226 pounds. (Tr. 200-201).  She complained of itching/rash on her right thigh.  (Id.)  Scoliosis was noted and she was given Lasix.  (Id.)  On April 26, 2002, Plaintiff reported to Franklin that she was doing well but complained of hypoglycemic symptoms due to diabetes and many episodes of low blood sugar levels.  (Id. at 198-199).  She weighed 234 pounds.  (Id.)  She was assessed with diabetes mellitus ("DM"), hypertension and arthritis, and was again advised to lose weight and exercise, and was given Norvasc and Bactrim.  (Id. at 199).

On June 14, 2002, Huguette Douyon, D.O. ("Dr. Douyon") examined Plaintiff at the Commissioner's request, at which time she reported a DM diagnosis, a longstanding history of back pain for the past 5-6 years, being diagnosed with a crooked spine, difficulty bending/lifting, neck pain radiating down to her right arm, neck arthritis, the need to wear a wrist brace on her right wrist due to pain, a history of asthma, and a pack per day cigarette habit since age 15.  (Tr. 206-208).  She weighed 255 pounds and reported having throbbing pain in her neck which radiates to her arm, for which she takes Tylenol Arthritis to help alleviate the pain.  (Id.)  Dr. Douyen noted that Plaintiff had diffused tenderness on palpation on her back, and that due to her obesity, it was very difficult to appreciate any kyphoscoliosis.  (Id. at 207).  He further noted that the back pads and folds of her back were unremarkable in height, and that no ROM restrictions of her back were noted.  (Id.)  Based upon his physical examination of Plaintiff,  Dr. Douyen concluded that Plaintiff had no edema, that she ambulated without a limp and did not require use of any assisted devices.  (Id. at 208).  He also found that most systems were normal, and that although she had a wrist brace, her wrist ROM was unremarkable when she removed brace, and she was able to use her wrist

throughout her visit without any restrictions.  (<u>Id</u>.)  He found that while Plaintiff complained about wrist pain, no joint abnormalities were noted.  (Tr. 207).  Dr. Douyen diagnosed Plaintiff with DM Type II; hypertension; morbid obesity; reported history of arthritis, noting that "it is most likely that the arthralgias are related to her obesity[;]" a reported history of asthma; a reported history of scoliosis; probable carpal tunnel syndrome in her right wrist; and a tobacco abuser.  (<u>Id</u>. at 208).  On the same date of the examination, Dr. Douyen also completed a Range of Motion Report for Plaintiff in which he found that her grip strength was 3/5 on the right and 4/5 on the left; her shoulder, elbow, wrist, ankle and hip were within normal limits; and her knee, cervical spine and lumbar spine had some limitation.  (<u>Id</u>. at 209).  Additionally, on July 1, 2002, a DDS physician concluded that when considering Plaintiff's diagnoses of diabetes, arthritis, back problems, asthma and poor vision, he did not find compelling objective evidence of a severe medical impairment.  (<u>Id</u>. at 268).

From 2002-2004, Plaintiff was treated on approximate 17 occasions by Dr. Evans and others at the Mobile County Health Department ("MCHD").  (<u>Id</u>. at 279-307, 368-372, 385-389).  During her course of treatment, Plaintiff presented with a host of ailments, including numbness in her hands, pain and swelling in her feet, shoulder, and arms, joint aches and pains, chest discomfort, asthma, wheezing, coughing and diabetes.  (<u>Id</u>.)  She was assessed with stable hypertension, stable IRDM, asthma, pedal edema, morbid obesity, diabetic neuropathy, and bursitis.  (Tr. 279-307, 368-372, 385-389).  She was prescribed various medications, and was advised to quit smoking, lose weight, and elevate her legs to reduce edema.  (<u>Id</u>.)

From March 22-April 4, 2003, Plaintiff was treated at the Infirmary for complaints of asthma and shortness of breath.  (<u>Id</u>. at 211-263, 333-358).  The relevant records reveal that Plaintiff was admitted to the Infirmary ER with significant shortness of breath with dyspnea, acute exacerbation

of apparent asthma and acute bronchitis.  (Id.)  It was noted that Plaintiff was obese, had elevated blood sugars consistent with her history of diabetes mellitus, that she developed a migraine headache, and that her blood pressure was elevated.  (Id.)  Her blood pressure medicine was adjusted, she was treated with Imitrex for her migraine, and started on steroids.  (Id.)  It was further noted that Plaintiff's condition initially improved, and then, after a couple of days worsened, as she developed problems in the bronchial area.  (Tr. 211-263, 333-358).  She underwent a fiberoptic bronchoscopy on April 2, 2003; however the cytology and cultures were unremarkable.  (Id. at 333-358).  The treatment notes further reflect that Plaintiff had an unremarkable CT of her chest, which only showed hyperinflation; that her echocardiogram was essentially unremarkable, except for it being a difficult study due to limited acoustic windows; and her electrocardiogram was essentially normal, except for nonspecific T-wave abnormality.  (Id. at 335-336, 349).  Plaintiff was discharged with a diagnosis of asthmatic bronchitis status asthmaticus; atypical tracheal bronchitis with bronchospasm; tobacco abuse; morbid obesity; hypertension; DM Type II uncontrolled but coming under better control at discharge; anemia; heme positive stools; history of migraines; hypomagnesemia; hyponatremia; dyspepsia; epigastric abdominal pain; elevated liver function studies.  (Id. at 334-335).  Plaintiff was prescribed various medications, provided a home nebulizer, and home glucometer, and advised to record her blood sugar readings, adhere to a 1,800 calorie ADA, low salt diet, and to follow-up with her regular physician.  (Id.)

On June 20, 2003, Plaintiff underwent pulmonary function testing.  (Id. at 264-267).  She weighed 270 pounds.  (Tr. 264-265).  No significant abnormalities were noted.  (Id. at 264-267).  Plaintiff reported to the Infirmary ER on June 26th with complaints of shortness of breath, wheezing, "asthma acting up," and having low blood glucose.  (Id. at 359-367).  A physical examination

revealed that Plaintiff's extremities were non-tender, she had a normal ROM, and no pedal edema. (Id. at 362). Plaintiff's heart, lungs and mediastinum were all within normal limits. (Id. at 365). Her chest x-rays revealed a normal chest and her exam revealed audible wheezing. (Id. at 359-367). She was diagnosed with acute exacerbation of asthma, Type II DM, GERD and diabetic gastropathy. (Tr. 362). Plaintiff was advised to decrease her insulin by ten units, and to follow-up with her regular physician. (Id. at 367).

On July 14, 2003, State Agency physician Angela Lassiter reviewed Plaintiff's medical records and assessed her physical RFC as follows: she could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk/sit for 6 hours in an 8 hour workday; is limited in her push/pull abilities in her upper extremities; can occasionally climb ladders, ropes and scaffolds; can frequently climb ramps and stairs as well as balance, stoop, kneel, crouch and crawl; has no manipulative, visual, communicative or environmental limitations, other than to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Id. at 271-278).

On July 21, 2003, Plaintiff presented to the Stanton Clinic with complaints of right shoulder pain and right hand pain. (Id. at 196-197). Her x-rays were normal except that "FB(R) hand, shoulder (-)" was noted. (Id. at 197). She was given trigger injections. (Id. at 196).

On March 4, 2004, Dr. Evans completed a Physical Capacities Evaluation ("PCE"), in which he concluded that Plaintiff can sit for 3 hours at one time and in total during an 8 hour workday; stand or walk for 2 hours at one time and for 3 hours in an 8 hour workday; can occasionally lift/carry up to 20 pounds; can continuously lift/carry up to 5 pounds; can use her left hand for simple grasping but not pushing/pulling of arm controls or fine manipulation; cannot use her right hand for simple grasping, pushing/pulling of arm controls or fine manipulation; cannot use her feet

for repetitive action; can occasionally bend, crawl, climb and reach; cannot squat; and has no restrictions of activities involving unprotected heights, moving machinery, exposure to marked changes in temperature and humidity, driving automotive equipment and exposure to dust, fumes and gases. (Tr. 374). Dr. Evans opined that Plaintiff cannot work 8 hours per day, 40 hours per week, on a sustained basis. (Id.)

On May 4, 2004, Plaintiff was examined by S.K. Pace, M.D. ("Dr. Pace") at the Commissioner's request. (Id. at 375-380). She weighed 290 pounds. (Id. at 376). Her physical examination was normal. (Id.) No tender points were noted. (Id.) Dr. Pace observed that Plaintiff had no impairment in her ability to arise from a chair or move on and off an examining table. (Tr. 376). Her neurological exam was normal, and she had a full ROM of all of her joints. (Id.) Dr. Pace noted that her right hip x-ray revealed mild degenerative changes; her cervical spine series revealed normal alignment of vertebral bodies with well preserved disc space areas; and her L/S spine series revealed mild degenerative changes of L5 but otherwise a normal study. (Id. at 377-380). Dr. Pace assessed Plaintiff with a history of asthma, tobacco use, hypertension, DM, history of trigger finger of the right thumb, diffuse osteoarthritis, chronic low back pain, a history of thrombectomy of the right hand, a history of hematoma excision of the right knee, and a history of BTL. (Id. at 377). Dr. Pace concluded that she has a history of shortness of breath and wheezing complicated by a long history of tobacco use (more compatible with COPD than asthma), her diabetes was reasonably well controlled without complications, her multiple complaints of pain were consistent with osteoarthritis, she had no evidence of cervical or lumbar radiculopathy, and she was markedly obese and would benefit from weight reduction therapy. (Id.) Dr. Pace opined that Plaintiff has no impairment in her abilities to sit, stand or walk for short distances, lift/carry light

loads, handle objects, communicate effectively and complete routine daily tasks required by her employment.  (Id. at 377).

Dr. Pace also completed a Medical Source Opinion (Physical) form in which he found that Plaintiff has no limitations in her abilities to stand, walk or sit; can lift/carry 10-20 pounds constantly, 20-25 pounds occasionally and 25-30 pounds frequently; can constantly push/pull with both arms and legs, climb, balance, stoop, kneel, crouch, crawl, handle, finger, feel, talk, hear and reach overhead; can occasionally work in environments with extreme hot, cold, wetness/ humidity, vibration, exposure to fumes, dust, gases and poor ventilation, proximity to moving mechanical parts, in high exposed places, and drive automotive equipment.  (Tr. 381-383).

On May 21, 2004, Lexoy Tha Thornton, M.D. ("Dr. Thornton") concluded, in a Request for Medical Information regarding work requirements form for the State of Alabama Food Stamp Program, that Plaintiff is not able to work due to her IRDM, diabetic neuropathy, hypertension, atypical CP, PUD, GERD, pedal edema, arthritis and asthma.  (Id. at 391).

1.     **Whether the ALJ erred by failing assign controlling weight to the opinion of Plaintiff's treating physician?**

Plaintiff contends that the ALJ failed to assign controlling weight to the opinion of Plaintiff's treating physician Gregory Evans, M.D. ("Dr. Evans") (finding that her RFC was severely eroded), and to certain records from MCHD where he practices.  Dr. Evans concluded, in his March 4, 2004 Physical Capacities Evaluation ("PCE"), that Plaintiff can sit for 3 hours at one time and in total during an 8 hour workday; stand/walk for 2 hours at one time and for 3 hours in an 8 hour workday; occasionally lift/carry up to 20 pounds; continuously lift/carry up to 5 pounds; can use her left hand for simple grasping but not for pushing/pulling of arm controls or fine manipulation; cannot use her right hand for simple grasping, pushing/pulling of arm controls or fine manipulation; cannot use her

14

feet for repetitive action; can occasionally bend, crawl, climb and reach; cannot squat; and has no environmental restrictions.  (Tr. 374).  From this, Dr. Evans concluded that Plaintiff cannot work 8 hours per day, 40 hours per week, on a sustained basis.  (Id.)

Eleventh Circuit case law provides that controlling weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  See, e.g., Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1159-1160 (11th Cir. 2004); Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); 20 C.F.R. § 404.1527(d)(2).  "[G]ood cause exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips, 357 F.2d at 1240-1241 (citing to Lewis, 125 F.3d at 1440).  See also Edwards v. Sullivan, 937 F.2d 580 (11th Cir. 1991) (holding that the ALJ properly discounted a treating physician's report where the physician was unsure of the accuracy of his findings and statements).  When a treating physician's opinion does not warrant controlling weight, the ALJ must clearly articulate his reasons, which must also be legally correct and supported by substantial evidence in the record.  See, e.g., Crawford, 363 F.3d at 1159-1560; Lamb v. Bowen, 847 F.2d 698, 703-704 (11th Cir. 1988).

In the case sub judice, the ALJ assigned controlling weight to the May 4, 2004 consultative examination findings of Dr. Pace, rather than to March 4, 2004 PCE findings of Plaintiff's treating physician, Dr. Evans.  The ALJ found as follows:

> . . . . She was evaluated by one consultative physician since January 2003, Dr. S.K. Pace, an internist . . . . The cumulative review of the same medical reports depicts the claimant as a long time smoker who refuses to follow medical advice, thereby seriously aggravating an asthma condition and triggering episodes of asthmatic

bronchitis. While she is quite obese approaching 300 pounds, the claimant's diffuse very mild degenerative arthritis has never led to more significant complications like joint deformities, or even restricted range of joint motion. The May 2004 consultative examination by Dr. Pace even found the claimant's gait normal and unlimited without any "assistive device." Ms. Pettis could perform requested heel and toe walking maneuvers and squat and arise without discernible "difficulty." The claimant's fine motor control and grip strength was unimpaired in the upper extremities, and she had, in complete contrast to her subjective account, no peripheral edema, swelling, or sensory loss in her feet or lower legs. The claimant's reported high blood pressure and diabetic conditions were considered under excellent control . . . .

* * *

. . . . I have conducted a meticulous review of the claimant's testimony and the medical and documentary reports contained in the record . . . .

* * *

. . . the medical evidence referable to the claimant's impairments does not identify any reliable manifestations of a disabling loss of functional capacity resulting from her reported chronic, debilitating symptomatology. For example, Dr. Pace's consultative examination did not even find an objective basis for the claimant's reported sue [sic] of a cane or, for that matter, her alleged frequent give-away muscle weakness in the legs and resultant impaired sense of balance. He found no signs of motor in-coordination, sensory loss, reflex deficits, or even reduced range of motion in the extremities, and observed no ongoing muscle spasms or reduced mobility in her lower back or neck or swelling in her lower legs or feet. Instead, the claimant could squat and arise and ambulate without difficulty; and she retained excellent muscle strength in her arms, legs, and hands, including unimpaired 5/5 bilateral grip strength. Dr. Pace described the claimant's diabetes as "reasonably well controlled without complications" and free of any ongoing signs of lumbar radiculopathy from the very "mild" degenerative changes noted on x-rays of her lumbar spine at L5-S1. The claimant's cervical spinal x-rays were completely within normal limits.

. . . . I chose not to at all believe the claimant's more recent subjective account . . . any symptoms reported to treating physicians must be viewed with caution since they come from a claimant with poor overall credibility.

. . . . Her underling [sic] diabetic and asthma conditions have been described as stable following previous hospitalizations, as well as during Dr. Pace's May 2004 consultative internal medicine report.

I have fully considered the reports prepared and functional and symptoms assessments made by Dr. Gregory Evans, especially the March 2004 functional evaluation . . . . However, I chose not to assign significant evidentiary weight to his medical opinion and diagnostic assessment for the myriad of reasons already articulated. He repeatedly characterizes the claimant's diabetes as "stable" and

frequently admonishes her to cease smoking and bring better control over her respiratory symptoms . . . . He also points to no specific clinical abnormalities or physical examination findings supporting his draconian functional restrictions. Indeed, while Dr. Evans says in March 2004 the claimant cannot squat at all when working, Dr. Pace found her two months later quite able to squat and arise without difficulty. Given Dr. Pace's superior qualifications as a board certified internist and better narrative explanation of his findings (as opposed to Dr. Evans often nearly illegible clinic notations), as well as the clamant's overall poor credibility, I chose to assign the greatest weight to his opinion and, especially, functional assessment. . . .

(Tr. 25-27 (citations omitted)).

The undersigned finds that the ALJ did not err in failing to assign controlling weight to Dr. Evans' March 4, 2004 PCE findings and various MCHD treatment records. Dr. Pace's May 4, 2004 findings - both from his physical exam and as contained in his Medical Source Opinion form - are consistent with the overall medical evidence of record, whereas Dr. Evan's March 2004 finding, of a severely eroded RFC, stands in isolation.[8] Specifically, despite a record full of extensive medical treatment notes, none of the treatment records contain findings which indicate that Plaintiff has work-related functional limitations of the severity assessed by Dr. Evans. See supra. Rather, Plaintiff's treatment notes support Dr. Pace's findings (i.e., that there was no evidence of diabetic complications, her osteoarthritis was only mild, she had normal chest x-rays, and her pulmonary function test was normal). Id. In fact, Dr. Pace was not the only physician who concluded that Plaintiff's restrictions were simply not as extensive as Dr. Evans claimed. For example, a State Agency physician reviewed the medical records and concluded in July 2003 that Plaintiff could perform a range of medium work. (Tr. 271-278). Similarly, the contrasting nature of Dr. Evan's

---

[8]The undersigned notes that while a May 21, 2004 Food Stamp form, completed by Dr. Lexoy Tha Thornton, concluded that Plaintiff is not able to work due to her IRDM, diabetic neuropathy, hypertension, atypical CP, PUD, GERD, pedal edema, arthritis and asthma, it is not clear whether Dr. Thornton ever examined Plaintiff nor reviewed her medical records. (Tr. 391). Moreover, Dr. Thornton failed to cite to any medical evidence to support the finding of disability. (Id.)

PCE determination is apparent from one particularly dramatic difference: Dr. Evans concluded that Plaintiff could *never* squat in March 2004, but just 2 months later, Dr. Pace found, after conducting both a physical exam <u>and</u> a review of her medical records, *that she could squat and rise without difficulty*. <u>See</u> <u>supra</u>. Moreover, the treatment notes from Plaintiff's ER visits do not reflect such restrictions in Plaintiff's range of motion. <u>Id</u>. These facts support the ALJ's assignment of weight to Dr. Pace. <u>See</u>, <u>e.g.</u>, <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584-585 (11th Cir. 1991) (noting that an ALJ may properly rely upon the opinion of non-examining physician where that opinion is consistent with the opinions of an examining physician); <u>Richardson v. Perales</u>, 402 U.S. 389, 408 (1971) (holding that use of non-examining medical expert is proper); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2) (providing that the Commissioner considers the opinions of State Agency physicians as expert opinions).

Additionally, even though Dr. Evans was Plaintiff's treating physician at MCHD from 2002-2004, Dr. Pace's May 4, 2004 consultative examination and Medical Source Opinion form actually provide a more complete and comprehensive review of her functional abilities. First, at the exam, Dr. Pace reviewed her medical history and noted her diagnoses of asthma complicated by a long history of tobacco use, reasonably well controlled diabetes without complications, obesity, and that there was no evidence of cervical or lumbar radiculopathy. (Tr. 375-377). Dr. Pace's physical examination also revealed that Plaintiff wore a right thumb brace; was alert; was obese; had an unremarkable head, eyes, nose and throat; had a supple neck with no JVD, bruits or masses; her lungs had bilateral breath sounds with minimal and expiratory wheezes; her heart, abdomen and back were normal; her extremities were normal with a full ROM; her musculoskeletal system was normal; she had no impairments in her ability to arise from a chair or move on/off of the examining

table; she had no lesions in her skin; her neurological exam was normal; she could squat and rise unimpaired; and her mental status was intact. (Id.) Dr. Pace also noted that Plaintiff reported that she was able to walk 2 blocks without rest; she had no radiation of pain, associated weakness or numbness; and she had no tender points. (Id.) Dr. Pace found that while Plaintiff had some "mild" degenerative changes in her right hip and L/S spine, she had normal x-ray results. (Id.) Based upon his review of the records and physical exam of Plaintiff, Dr. Pace properly concluded that she had no limitations or impairments in her abilities to sit, stand or walk for short distances, lift or carry light loads, handle objects, communicative effectively and complete routine daily tasks required by her employment. (Id.)

On the other hand, Dr. Evan's PCE findings are conclusory. For instance, although Dr. Evans concluded that Plaintiff could never squat and could only stand or walk for 3 hours during an 8 hour workday, he cited to no specific abnormalities, physical findings or objective testing to support his PCE determination. Put simply, he provided no basis for his severe restrictions, much less any reference to medical evidence of record in support of same. See supra. The aberrant nature of Dr. Evan's PCE determination is underscored by a review of his own MCHD treatment notes, a review which reveals that Dr. Evan's PCE is inconsistent with his own records. See, e.g., Hudson v. Heckler, 755 F.2d 781, 784 (11th Cir. 1985) (providing that an ALJ may reject a treating physician's opinion if it is so brief and conclusory that it lacks persuasive weight or is unsubstantiated by any clinical or laboratory findings); Bloodsworth, 703 F.2d at 1240 (same). For example, while it is true that Plaintiff was treated for years at MCHD, where Dr. Evans practices, none of the treatment records suggest that Plaintiff is disabled or that she has work-related functional limitations. (Tr. 280, 283, 285, 289, 368-372, 385-389). Over the years, Plaintiff presented to

MCHD for a variety of ailments, including back, shoulder and arm pain, wheezing, arthritis and obesity; however, the doctors regularly concluded that most of her problems were stable (i.e., stable GERD, stable hypertension, stable diabetes).  (Id.)  Moreover, the records reflect that the most "restrictive" instruction Dr. Evans gave to Plaintiff, was for her to elevate her leg to reduce some trace or mild pedal edema.  (Id.)  Of course, he also repeatedly advised her to lose weight and quit smoking in order to improve her health.  (Id.)  As such, the ALJ properly assigned due weight to Dr. Pace's findings.  See, e.g., Gibson v. Heckler, 779 F.2d 619, 723 (11th Cir. 1986) (providing that while generally not entitled to more weight than a treating physician, a non-treating physician's opinion is entitled to some weight).

**2.      Whether the ALJ erred by failing to properly consider the effects of Plaintiff's obesity?**

Plaintiff contends that while the ALJ noted that she was obese, he failed to assess whether her obesity impacts her physical impairments and her ability to perform work-related functions under SSR 02-1p.  Plaintiff cites to the fact that she weighs nearly 300 pounds as well as to certain findings in the record, to assert that her ability to perform work-related functions has been severely eroded due to obesity.

Social Security Regulation ("SSR") 02-1p provides that an ALJ must explain how conclusions regarding a claimant's obesity are reached.  SSR 02-1p, 2000 WL 628049, *6 (S.S.A). The regulation requires the ALJ to consider the effects of obesity at steps three and four when combined with other impairments.  Id.  Section 1.00Q of the Listing of Impairments provides that when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps, including when assessing an individual's

RFC, adjudicators must consider any additional and cumulative effects of obesity.[9]  20 C.F.R., Pt. 404, Subpt. P, App. 1; 20 C.F.R. § 404.1523.   SSR 02-1p further provides that an ALJ must determine whether obesity prevents an individual from working in the national economy at step five. Id.; SSR 02-1p, 2000 WL 628049.

In the case sub judice, the ALJ stated as follows with regard to Plaintiff's obesity:

. . . . She described herself as 5'2" tall weighing 279 pounds. . . . Ms. Pettis testified that her pain kept her from exercising and losing weight, as has been recommended by several treating physicians . . . .

* * *

. . . . She was evaluated by one consultative physician since January 2003, Dr. S.K. Pace, an internist . . . . The cumulative review of the same medical reports depicts the claimant as a long time smoker who refuses to follow medical advice, thereby seriously aggravating an asthma condition and triggering episodes of asthmatic bronchitis. While she is quite obese approaching 300 pounds, the claimant's diffuse very mild degenerative arthritis has never led to more significant complications like joint deformities, or even restricted range of joint motion. The May 2004 consultative examination by Dr. Pace even found the claimant's gait normal and unlimited without any "assistive device." Ms. Pettis could perform requested heel and toe walking maneuvers and squat and arise without discernible "difficulty." The claimant's fine motor control and grip strength was unimpaired in the upper extremities, and she had, in complete contrast to her subjective account, no peripheral edema, swelling, or sensory loss in her feet or lower legs. The claimant's reported high blood pressure and diabetic conditions were considered under excellent control . . . .

* * *

. . . . The claimant's most significant impairment appears to be morbid obesity at around 290 pounds.

* * *

---

[9]Listing 1.00Q, regarding obesity, provides as follows:

Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal, respiratory or cardiovascular system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal, respiratory or cardiovascular impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt P. App. 1, Listing 1.00Q.

. . . . Does the claimant truly need a cane to support her weight and avoid losing balance or can she ambulate and squat and arise unimpaired and without difficulty? I chose to not at all believe the claimant's more recent subjective account . . . any symptoms reported to treating physicians must be viewed with caution since they come from a claimant with poor overall credibility.

* * *

. . . I have fully considered the potential aggravating effects the claimant's considerable obesity (at nearly 300 pounds) could have on her musculoskeletal, respiratory, and endocrine impairments (Social Security Ruling 00-3p). While the claimant's large body habitus obviously increases the severity of any ongoing stress on her major weight bearing joints, the additional and cumulative effects of her obesity must still be linked to underlying spinal or joint conditions that could be expected to cause her the symptoms described, e.g., like spondylosis, disc herniation, spinal stenosis, etc. The fact remains the claimant's musculoskeletal problems have been traced to no more than very mild diffuse, generalized arthritic changes. There is no objective confirmation of any prior surgical treatment of her knees, especially the supposed surgical removal of her right kneecap. Her endocrine condition is reasonably well controlled by prescribed medication according to treating and consultative sources, and all medical sources agree the claimant's cessation of smoking would have a huge beneficial effect on her pulmonary-related symptoms.

As a result . . . . Ms. Pettis retains the residual functional (exertional) capacity to make a successful vocational adjustment to light work existing in significant numbers in the national economy . . . .

(Tr. 20, 25, 27-28).

Here, the ALJ not only noted that Plaintiff was obese, but specifically considered the potential aggravating effects of her considerable obesity. Obesity, however, is not disabling per se. In order to be considered disabling, obesity must be found to be a severe impairment accompanied by work-related functional limitations. See, e.g., Wind v. Barnhart, 133 Fed. Appx. 684, 690-691 (11th Cir. 2005); Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). The undersigned's review of the record reveals that while the ALJ found that Plaintiff is obese, he properly concluded that her obesity has not resulted in problems other than very mild diffuse, generalized arthritic changes, and thus, is not accompanied by work-related functional limitations. See supra.

Specifically, the medical evidence of record supports the ALJ's decision. At the outset, it

22

is noteworthy that at the administrative hearing, Plaintiff did not provide any testimony relating to any problems due to obesity, nor did she contend that it resulted in any functional limitations.  See supra.  Rather, Plaintiff testified that her worst problems were her diabetes, back and feet.  Id. Similarly, Plaintiff did not list obesity as an impairment in any of her benefits applications.  Id.

Additionally, what is striking from the voluminous medical record is the fact that no physician - treating or otherwise - ever concluded that Plaintiff has work-related limitations of function due to her obesity.  Rather, substantial evidence of record reveals that Plaintiff: 1) was diagnosed with obesity/morbid obesity, with recommendations for a reduced diet and for her to exercise and lose weight; 2) had weight fluctuations from 210 pounds in November 1999 to 294 pounds in April 2004; and 3) had stable hypertension, stable GERD, stable diabetes, only mild arthritis/DDD, mild or trace pedal edema, asthma, and only sometimes, a mild limitation in her ROM.  See supra.  Similarly, in May 2003, Plaintiff reported that her medications relieved her pain for up to 3-4 hours at a time, and a June 2003 pulmonary test revealed no abnormalities.  Id.

Moreover, while the ALJ concluded that she "possesses combined severe, functionally limiting respiratory, endocrine and musculoskeletal-related impairments[,]" he explained that Plaintiff's allegations of chronic, debilitating pain, swelling muscle weakness, shortness of breath, dizziness, easy fatigability, and other related symptoms cannot at all be considered credible to the extent alleged.  (Tr. 29).  The ALJ attributed this to the following: 1) the vast disparity between the alleged intensity and persistence of symptoms and the clinical test results and other objective measurements; 2) the absence in the record of documentation of reliable manifestations of disabling loss of functional capacity secondary to such symptoms; 3) past treatment successfully alleviating many of her symptoms; 4) her failing to follow medical advice regarding the need to quit smoking,

23

thus seriously aggravating her pulmonary condition(s); and 5) her providing of contradictory assertions. (Id.) Significantly, none of these problems have been linked to her obesity, by either the ALJ or any physician of record.

For instance, Plaintiff's mild arthritis was never found to result in any more significant complications such as joint deformities, spinal stenosis or nerve root compression with accompanying cervical or lumbar radiculopathy - or even anything more than just a sometimes, mildly, limited ROM.  See supra.  Indeed, the only evidence of record which could arguably be construed to support Plaintiff's obesity aggravation claim is that of Dr. Duoyen, who stated in June 2002, when Plaintiff weighed 255 pounds, that she had "some" limitation in her cervical and lumbar ROM, it was difficult to assess any kyphoscoliosis due to her obesity, and "it is most likely that the arthralgias are related to her obesity[.]"  (Tr. 206-208).  However,  Dr. Douyen did not find that Plaintiff had any work-related limitations of function due to her obesity.  (Id.)  In fact,  he concluded that she had no restrictions in her ROM in her shoulder, elbow, waist, ankle and/or hip, that she had no edema, and that she could ambulate without assistance.  ( Id.)  Additionally,  during March-April 2003, the doctors at the Infirmary ER found that Plaintiff had no arthritic changes, no significant joint effusion, no evidence of organic bone disease and that her joints were satisfactorily maintained. See supra.  Similarly, as of May 2004, Dr. Pace's physical examination revealed that she had a normal gait, which was unlimited, without the need for any assistive device; she could perform requested heel and toe walking maneuvers; she could squat and arise without difficulty; her fine motor control and grip strength were unimpaired in her upper extremities; she had no peripheral edema, swelling or sensory loss in her feet or legs; her high blood pressure and diabetic conditions were stable and under control with medication; and temporary oral steroid treatment successfully

24

alleviated certain respiratory symptoms.  Id.  The bottom line is that the record contains no clinical or objective medical evidence indicating any exertional or work-related functional limitations caused by Plaintiff's obesity.  See, e.g., Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999); Wheeler v. Heckler, 784 F.2d 1073, 1076 (11th Cir. 1986).

Furthermore, Plaintiff has failed to cite to any evidence of record in support of a finding that she has obesity-related work-related functional limitations, and no physician ever found that she was disabled due to her obesity or that work-related functional limitations on her activities were necessary due to her obesity.  See, e.g., Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984).  In sum, there was simply no basis upon which the ALJ could have concluded that Plaintiff's obesity was a severe impairment resulting in work-related limitations of function.  See, e.g., James v. Barnhart, 177 Fed. Appx. 875, 878 at n. 2 (11th Cir. 2006); Wind, 133 Fed. Appx. at 690-691; Gross, 785 F.2d at 1166.

**V.    Conclusion**

For the reasons set forth, and upon consideration of the administrative record and memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner of Social Security, denying her claim for widow's insurance benefits and supplemental security income, is due to be **AFFIRMED.**

The attached sheet contains important information regarding objections to this Report and Recommendation.

**DONE** this the **8th** day of **March, 2007.**

**/s/ Sonja F. Bivins**
**UNITED STATES MAGISTRATE JUDGE**

25

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.      **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(c); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                         <u>/s/SONJA F. BIVINS</u>
                         **UNITED STATES MAGISTRATE JUDGE**